☑ FILED ___ LODGED
___ RECEIVED ___ COPY

AUG 2 3 2022

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY_____ DEPUTY

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA
PHOENIX DIVISION

| | | |
|---|---|---|
| [UNDER SEAL], | § | ORIGINAL COMPLAINT FOR VIOLATIONS OF FEDERAL FALSE CLAIMS ACT **SEALED** |
| Plaintiff, | § | |
| | § | **DOCUMENT FILED UNDER SEAL** |
| v. | § | PURSUANT TO 31 U.S.C. § 3730 (b)(2) |
| | § | DO NOT PUT ON PACER |
| [UNDER SEAL], | § | DO NOT PLACE IN PRESS BOX |
| Defendants. | § | <u>JURY TRIAL DEMANDED</u> |

**CV22-01421-PHX-ROS**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA
PHOENIX DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA *ex. rel.* WADE RINER | § § § | CIVIL NO. _____ |
| Plaintiff, | § § § § § | **RELATOR WADE RINER'S ORIGINAL COMPLAINT** |
| v. | § § § § | **FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730 (b)(2)** |
| RECREATION CENTERS OF SUN CITY WEST, INC., ET AL. | § § § | |
| Defendants. | § | **JURY TRIAL DEMANDED** |

**RELATOR WADE RINER'S ORIGINAL COMPLAINT**

**TABLE OF CONTENTS**

**Page**

I.     INTRODUCTION: COVID-19, PPP, AND THE OPPORTUNISTS ..................................................1

II.    PARTIES ................................................................................................................3

III.   RESPONEAT SUPERIOR AND VICARIOUS LIABILITY ................................................6

IV.   JURISDICTION AND VENUE ....................................................................................6

V.    ORIGINAL SOURCE AND DISCLOSURES....................................................................6

VI.   THE PAYCHECK PROTECTION PROGRAM....................................................................6

VII.  DEFENDANTS' FRAUD ..........................................................................................13

VIII. ACTIONABLE CONDUCT BY DEFENDANTS ............................................................22

      A.    FALSE CLAIMS ACT ................................................................................22

      B.    DEFENDANTS' VIOLATIONS OF THE FALSE CLAIMS ACT...........................23

        i.    PRESENTATION OF FALSE OR FRAUDULENT CLAIMS (31 U.S.C. § 3729(a)(1)(A)) 23

        ii.   MAKING OR USING—OR CAUSING TO BE MADE OR USED—FALSE RECORDS OR STATEMENTS MATERIAL TO FALSE OR FRAUDULENT CLAIMS (31 U.S.C. § 3729(a)(1)(B)) ........................................................................................ 24

      C.    DEFENDANTS' VIOLATIONS OF THE FALSE CLAIMS ACT ARE MATERIAL. .........................................................................................25

IX.   CAUSES OF ACTION............................................................................................27

      A.    COUNT I – PRESENTATION OF FALSE OR FRAUDULENT CLAIMS (31 U.S.C. § 3729(a)(1)(A)) ........................................................................................27

      B.    COUNT II – MAKING OR USING FALSE STATEMENTS MATERIAL TO FALSE OR FRAUDULENT CLAIMS (31 U.S.C. § 3729(a)(1)(B)) ................................28

X.    PRAYER FOR RELIEF............................................................................................30

XI.   DEMAND FOR JURY TRIAL ..................................................................................30

Plaintiff/Relator Wade Riner ("Relator" or "Riner") brings this action pursuant to the False Claims Act (FCA), 31 U.S.C. §§ 3729–32, and seeks to recover all damages, penalties, and other remedies established by the FCA on behalf of the United States of America and on his own behalf. Relator respectfully shows the following:

## I.    INTRODUCTION: COVID-19, PPP, AND THE OPPORTUNISTS

1.    After the crisis of the COVID-19 Coronavirus pandemic began, Congress passed the Coronavirus Aid, Relief, and Economic Security Act—more commonly referred to as the "CARES Act"—in part to provide emergency relief to small businesses facing payroll difficulties and other concerns meeting their bottom-line in the midst of the pandemic. Unfortunately, this aid also attracted opportunistic actors who received aid that Congress never intended. Congress created the PPP in March 2020, as part of the Coronavirus Aid, Relief and Economic Security (CARES) Act, to provide emergency financial support to the millions of Americans suffering the economic effects caused by the COVID-19 pandemic.  The CARES Act authorized billions of dollars in forgivable loans to small businesses struggling to pay employees and other business expenses.  Throughout 2020 and 2021, PPP loan applicants were required to certify that they were eligible to receive a PPP loan.

2.    Part of the aid in the CARES Act was the Paycheck Protection Program ("PPP"), which provides forgivable, emergency loans to small businesses that certify to the United States Small Business Administration that they are qualified to receive the interest-free loan, that their loan request is necessary for continued operation, and that they will use funds only to pay payroll expenses, rent, mortgage, interest, or utilities during a covered period.

1

3.      The PPP loans were originally intended to help traditional small businesses make it through the economic downturn that came as a consequence of the pandemic, but others wanted in.

4.      Numerous trade groups and similar associations lobbied Congress to be added as entities eligible for PPP loans. Among those groups were country clubs and community associations, which include housing cooperatives, condominium associations, and property owner associations.

5.      In December 2020, Congress passed and the president signed into law amendments to the CARES Act (the Economic Aid Act) that allowed housing cooperatives to apply for PPP loans. Condominium associations, homeowners associations, and other community associations were not included in the amendments, and neither were other not-for-profit organizations like country clubs. The list of eligible recipients only expanded one more time near the end of the final PPP application period—when President Biden signed the American Rescue Plan Act of 2021 into law on March 11, 2021, which included most 501(c) organizations as "additional covered nonprofit entities" but explicitly excluded 501(c)(4) organizations (the only 501(c) status for which a homeowners association or condominium association might be eligible).

6.      Despite the industry's recognition that Congress had not allowed their participation in the Paycheck Protection Program, numerous community associations, particularly condominium associations, homeowners associations, and other not-for-profit organizations, applied for PPP loans anyway, falsely certifying to the United States that they were eligible for funding and that they needed the loans after also certifying in the Application that "I have read the statements included in this form, including the Statements Required by Law and Executive Orders, and I understand them." They did so even though they had millions of dollars in revenue every

2

year that was not reliant on the unpredictable swings of the economy but instead on a simple tool: assessments to their wealthy membership. Many country clubs nationwide acted similarly. Rather than obtain PPP loans as the intended American businesses in need, Defendants approached the program as opportunists. And by fraudulently applying for these PPP loans, the rich got richer while depriving needy Americans of the boost that Congress sought to give them.

7.     In total, the Defendant not-for-profit condominium associations and not-for-profit homeowners associations fraudulently applying for PPP loans received millions of dollars in forgivable funding, directly depriving the United States of millions of dollars and preventing worthy and needy small businesses from receiving congressionally approved loans.

8.     Not-for-profit community associations were not the only culprits.  Not-for-profit so-called "country clubs" were not eligible and also wrongly applied for and received PPP.

9.     As Acting Assistant Attorney General Brian M. Boynton has explained, "PPP loans were intended to provide critical relief to small businesses so that they could pay employees and maintain operations," and the Department of Justice is "committed to pursuing those who knowingly violated the requirements of the PPP or other Covid-19 assistance programs and obtained relief funds to which they were not entitled"—particularly, with the assistance of *qui tam* relators.

## II.    PARTIES

10.     Plaintiff/Relator Wade Riner is a regular homeowner and investor. A corporation with which Riner is the officer and principle in turn owns multiple homes in Florida. Through ownership of these homes, Riner is a member of the Hunters Run Property Owners Association, Inc., and he was a member of the Boca West Master Association, Inc. until the fourth quarter of 2021.  Through his membership in these homeowners associations in Florida, he learned that his

homeowners associations had applied for millions of dollars of federal relief through PPP loans, even though they were not a business interest that qualified for such loans under the CARES Act. Riner subsequently learned that his own homeowners associations and numerous others defrauded the United States government by falsely certifying they were eligible for PPP loans that they were not, in fact, eligible for. Riner is intimately familiar with the finances and organization of these particular homeowners associations as well as homeowners associations in general, including details of how such community associations are governed and how they raise funds through their membership and other sources of liquidity.

11.     Defendants are all various not-for-profit entities. Although there may be some subtle differences in the Defendants' governing documents, Defendants can generally be categorized in one of three ways: as a not-for-profit homeowners association, a not-for-profit condominium association, or a not-for-profit country club.

12.     Recreation Centers of Sun City West, Inc. ("Sun City West Recreation") is a not-for-profit club located at 19803 N. R.H. Johnson Blvd, Sun City West, AZ.

13.     Briarwood Country Club Inc ("Briarwood Club") is a not-for-profit club located at 20800 N 135th Ave, Sun City West, AZ.

14.     The Country Club at DC Ranch ("DC Ranch Club") is a not-for-profit club located at 9290 E Thompson Peak Pkwy Unit 1, Scottsdale, AZ.

15.     DC Ranch Association, Inc ("DC Ranch Association") is a homeowner's association located at 20551 North Pima Rd, Suite 180, Scottsdale, AZ.

16.     DC Ranch Community Council ("DC Ranch Council") is a not-for-profit community association located at 20551 North Pima Rd., Scottsdale, AZ.

17.     Flagstaff Ranch Golf Club ("Flagstaff Golf Club") is a not-for-profit club located at 3850 S Lariat Loop, Flagstaff, AZ.

18.     Mirabel Golf Club, Inc. ("Mirabel Golf") is a not-for-profit club located at 37401 N Mirabel Club Dr, Scottdale, AZ.

19.     Residence Club Scottsdale at Troon North Owners' Association ("Residence Club Scottsdale") is a homeowners association located at 10650 E. Crescent Moon Dr., Scottsdale, AZ.

20.     Roadhaven Resort of Apache Junction ("Roadhaven Resort") is a not-for-profit community association located at 1000 S. Idaho Rd., Apache Junction, AZ.

21.     Saddlebrooke Homeowners Association No. 2, Inc ("Saddlebrooke HOA") is a homeowner's association located at 38735 S Mountain View Blvd, Tucson, AZ.

22.     Scottsdale Camelback Resort Association, Inc. ("Scottsdale Camelback") is a not-for-profit community association located at 6302 E Camelback Rd., Scottsdale, AZ.

23.     Sunbird Golf Resort Homeowners Association, Inc ("Sunbird Golf") is a homeowner's association located at 65250 S Sunbird Blvd, Chandler, AZ.

24.     Tanglewood Townhouse Association, Inc ("Tanglewood Townhouse") is a community association located at 1900 Country Club Dr., Flagstaff, AZ.

25.     The Tonto Verde Association ("Tonto Verde Association") is a homeowner's association located at 18401 El Circulo Drive, Rio Verde, AZ.

26.     Tonto Verde Golf Club, Inc ("Tonto Verde Golf") is a not-for-profit club located at 26604 N Forest Road, Rio Verde, AZ.

5

### III.   RESPONEAT SUPERIOR AND VICARIOUS LIABILITY

27.   Any and all acts alleged herein to have been committed by Defendants were committed by officers, directors, employees, representatives, or agents who at all times acted on behalf of the named Defendants and within the course and scope of their employment or agency.

### IV.   JURISDICTION AND VENUE

28.   Jurisdiction and venue are proper in the District of Arizona, pursuant to the False Claims Act (31 U.S.C. §§ 3729–33), because Relator's claims seek remedies on behalf of the United States for multiple violations of 31 U.S.C. §§ 3729–30, and the many of the Defendants can be found in this district. Because Defendants can be found in this state, personal jurisdiction is also proper.

### V.   ORIGINAL SOURCE AND DISCLOSURES

29.   There are no bars to recovery under 31 U.S.C. § 3730(e). To the extent that any allegations or transactions herein have been publicly disclosed, Relator has knowledge that is independent of and materially adds to any publicly disclosed allegations or transactions and had provided that information to the United States prior to filing the complaint by serving a voluntary Pre-Filing Disclosure Statement.

30.   As required by 31 U.S.C. §§ 3730(b) and (e), Relator submitted and Original Disclosure Statement to the Attorney General of the United States and the United States Attorney for the District of Arizona, as well as all material evidence and information, prior to filing and serving the Original Complaint.

### VI.   THE PAYCHECK PROTECTION PROGRAM

31.   On March 27, 2020, the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), Pub. L. 116-136, 134 Stat. 281, created the PPP, initially making $349 billion in

6

forgivable loans available to small businesses impacted by the COVID-19 pandemic. The U.S. Small Business Administration ("SBA") administers the PPP, promulgates the rules and regulations governing the PPP, and guarantees all PPP loans made by lenders.

32.    The PPP allowed small businesses (less than 500 employees) to obtain forgivable loans of up to $10 million, at 1% interest, to cover payroll costs, rent, mortgage interest, utilities, and other overhead expenses for a "covered period." CARES Act § 1102(a)(2)(36)(D)–(E), 134 Stat. at 288–90.

33.    PPP loans were processed and approved by qualified lenders that the SBA approves. Lenders issued PPP loans without the SBA's prior review or express and individualized approval, but they agreed to be responsible for determining borrower eligibility under the SBA's criteria. They were "deemed to have been delegated authority by the [SBA] Administrator to make and approve covered loans." CARES Act § 1102(a)(2)(36)(F)(ii), 134 Stat. at 290.

34.    For processing the PPP loans, the SBA reimbursed participating lenders with a processing fee equal to the amount of 5% of loans up to $350,000; 3% of loans between $350,000 and $2,000,000; and 1% on loans of at least $2,000,000. *See* CARES Act § 1102(a)(2)(36)(P), 134 Stat. at 293. Additionally, although the lenders funded the PPP loans with their own funds, the SBA 100% guaranteed these loans.

35.    PPP loans are also subject to complete forgiveness. CARES Act § 1106, 134 Stat. at 297–302. And within 90 days of which forgiveness is given, the SBA remits to the lender the full amount of forgiveness, plus any accrued interest. *Id.* § 1106(c)(3), 134 Stat. at 298.

36.    The PPP was a program under the Small Business Act, Section 7(a). Generally speaking, a key eligibility requirement for Section 7(a) SBA loans is that the applicant be a business operating for profit.

7

37.     Pursuant to the CARES Act, PPP loans were originally available only to a "business concern, nonprofit organization, veterans organization,[] Tribal business," or sole proprietorship that employed no more than 500 employees. *See* CARES Act § 1102(a)(2)(36)(D), 134 Stat. at 288. Nonprofit-organization eligibility, however, was limited to 501(c)(3) organizations that are tax exempt. *Id.* § 1102(a)(2)(36)(A)(viii).

38.     Eligibility for PPP is also spelled out in Interim Final Rule #1 published in the Federal Register on April 15, 2020 (answering the question, "How do I determine if I am ineligible?"). As it stated: "Businesses that are not eligible for PPP loans are identified in 13 CFR 120.110 and described further in SBA's Standard Operating Procedure (SOP) 50 10 Subpart B, Chapter 2, except that nonprofit organizations authorized under the Act are eligible." 85 Fed. Reg. 20812. Meanwhile, 13 CFR 120.110 states that "non-profit businesses" are ineligible.

39.     Applicants for PPP loans were required to certify to a participating SBA-approved lender and to the SBA that they are eligible to receive the loan under the rules in effect at the time of their application. This certification came right after a certification that the applicants "read the statements included in this form" and "understand them." For example, the April 2020 SBA Form 2483 (the PPP application at the time) required applicants to certify as follows:



**Paycheck Protection Program**
**Borrower Application Form**

**By Signing Below, You Make the Following Representations, Authorizations, and Certifications**

**CERTIFICATIONS AND AUTHORIZATIONS**

I certify that:

- I have read the statements included in this form, including the Statements Required by Law and Executive Orders, and I understand them.
- The Applicant is eligible to receive a loan under the rules in effect at the time this application is submitted that have been issued by the Small Business Administration (SBA) implementing the Paycheck Protection Program under Division A, Title I of the Coronavirus Aid, Relief, and Economic Security Act (CARES Act) (the Paycheck Protection Program Rule).
- The Applicant (1) is an independent contractor, eligible self-employed individual, or sole proprietor or (2) employs no more than the greater of 500 or employees or, if applicable, the size standard in number of employees established by the SBA in 13 C.F.R. 121.201 for the Applicant's industry.
- I will comply, whenever applicable, with the civil rights and other limitations in this form.
- All SBA loan proceeds will be used only for business-related purposes as specified in the loan application and consistent with the Paycheck Protection Program Rule.
- To the extent feasible, I will purchase only American-made equipment and products.
- The Applicant is not engaged in any activity that is illegal under federal, state or local law.
- Any loan received by the Applicant under Section 7(b)(2) of the Small Business Act between January 31, 2020 and April 3, 2020 was for a purpose other than paying payroll costs and other allowable uses loans under the Paycheck Protection Program Rule.

40.    The PPP applications also required applicants to certify that the loan request is necessary to support their ongoing operations. As SBA Form 2483 required:

**CERTIFICATIONS**

The authorized representative of the Applicant must certify in good faith to all of the below by initialing next to each one:

_____    The Applicant was in operation on February 15, 2020 and had employees for whom it paid salaries and payroll taxes or paid independent contractors, as reported on Form(s) 1099-MISC.

_____    Current economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant.

41.    Recognizing that some applicants might be confused by this economic-uncertainty certification, the SBA provided a "safe harbor" when it issued Interim Final Rule #4 (85 Fed. Reg. 23450 published April 28, 2020) stipulating that "any borrower that applied for a PPP loan and repays the loan in full by May 7, 2020, will be deemed by SBA to have made the required certification in good faith." Interim Final Rule #4 additionally noted that the SBA would give additional guidance before May 14, 2020 concerning this certification, especially in helping PPP borrowers evaluate whether they "may have misunderstood or misapplied the statutory standard." As of May 13, 2020, SBA clarified in its Frequently Asked Questions section of Interim Final Rule # 9, (85 Fed. Reg. 29845 published May 19, 2020) stating that "borrowers must make this

9

certification in good faith, taking into account their current business activity and their ability to access other sources of liquidity sufficient to support their ongoing operations in a manner that is not significantly detrimental to the business."

42.     PPP applications additionally required applicants' authorized representatives to specifically certify that all information provided on the application is true and accurate in all material respects as well as to certify their understanding that a false statement made in order to obtain a guaranteed loan from the SBA is punishable under the law. Again, from the April 2020 SBA Form 2483:

> ____  I further certify that the information provided in this application and the information provided in all supporting documents and forms is true and accurate in all material respects. I understand that knowingly making a false statement to obtain a guaranteed loan from SBA is punishable under the law, including under 18 USC 1001 and 3571 by imprisonment of not more than five years and/or a fine of up to $250,000; under 15 USC 645 by imprisonment of not more than two years and/or a fine of not more than $5,000; and, if submitted to a federally insured institution, under 18 USC 1014 by imprisonment of not more than thirty years and/or a fine of not more than $1,000,000.

43.     Finally, when PPP loan recipients apply for forgiveness of their loan, they must further certify, through their authorized representative, that they have "complied with all requirements in the Paycheck Protection Program Rules," including the statute passed in the CARES Act and the subsequent amendments. From SBA Form 3508S:

> **By Signing Below, You Make the Following Representations and Certifications on Behalf of the Borrower:**
> The Authorized Representative of the Borrower certifies to all of the below by initialing next to each one.
>
> ____  The Borrower has complied with all requirements in the Paycheck Protection Program Rules (Sections 7(a)(36), (7)(a)(37), and 7A of the Small Business Act, the PPP interim final rules, and guidance issued by SBA through the date of this application), including the rules related to:
> - eligible uses of PPP loan proceeds;
> - the amount of PPP loan proceeds that must be used for payroll costs (including proprietor expenses for Borrowers that applied for loans using SBA Forms 2483-C or 2483-SD-C);
> - the calculation and documentation of the Borrower's revenue reduction (if applicable); and
> - the calculation of the Borrower's Requested Loan Forgiveness Amount.
>
> Information regarding these requirements may be found in the Form 3508S Instructions and the Paycheck Protection Program Rules.

44.     The PPP was originally funded by Congress with $349 Billion, but the funds were depleted on April 16, 2020—only weeks after the CARES Act passed. On April 24, 2020, the

10

President signed the Paycheck Protection Program and Health Care Enhancement Act, Pub. L. 116-139, 134 Stat. 620, whereby Congress allocated an additional $320 Billion in funding.

45.    Congress further expanded the PPP at the end of the year in the Consolidated Appropriations Act, 2021, Pub. L. 116-260. The Consolidated Appropriations Act, 2021, added $284.5 Billion to the PPP. Additionally, the Act allowed certain entities to obtain "second draw" PPP loans. By May 5, 2021, these additional funds had also been depleted.

46.    One further amendment in the Consolidated Appropriations Act, 2021 made "housing cooperatives" eligible for PPP loans when it was enacted December 2020—but not homeowner associations, condominium associations, or other not-for-profit organizations. *See* Pub. L. 116-260, § 311(a). This is despite the fact that HOA condominium-association groups, along with country-club groups, lobbied Congress for their explicit inclusion.

47.    Congress expanded the list of eligible recipients one last time near the end of the final PPP application period—when the American Rescue Plan Act of 2021 was signed into law on March 11, 2021 and included most 501(c) organizations as "additional covered nonprofit entities." Yet Congress still explicitly excluded 501(c)(4) organizations—the only 501(c) status for which a homeowners association or condominium association might be eligible. Thus, homeowner associations and condominium associations were still clearly ineligible. And while certain nonprofit country clubs were then eligible for PPP loans, they were only eligible for the final weeks of the application period and only if they met the specific 501(c)(7) tax-exempt status. *See* 86 Fed. Reg. 15083 (explaining that the American Rescue Plan Act changes only "apply to PPP loans approved, and loan forgiveness applications submitted, on or after March 11, 2021").

11

48. The eligibility rules relevant to the Defendants for various nonprofit and not-for-profit organizations for PPP loans throughout the history of various congressional actions is summarized as follows:

| Entity Type | Eligibility Status & History |
|---|---|
| 501(c)(3) nonprofits | Always eligible (CARES Act) |
| Cooperative Associations | Eligible on or after Dec. 27, 2020 (Economic Aid Act) |
| 501(c)(7) nonprofits | Eligible on or after Mar. 11, 2021 (American Rescue Plan) |
| | |
| 501(c)(4) nonprofits | *Never* eligible |
| Not-for-profit homeowners associations | *Never* eligible |
| Not-for-profit condominium associations | *Never* eligible |
| Not-for-profit country clubs | *Never* eligible |

49. Additionally, for entities that applied for a second-draw PPP loan, they again were required to certify their eligibility under the effective rules. From SBA Form 2483-SD:



**Paycheck Protection Program**
**Second Draw Borrower Application Form**
**Revised March 18, 2021**

By Signing Below, You Make the Following Representations, Authorizations, and Certifications

I certify that:

- I have read the statements included in this form, including the Statements Required by Law and Executive Orders, and I understand them.

- The Applicant is eligible to receive a loan under the rules in effect at the time this application is submitted that have been issued by the Small Business Administration (SBA) and the Department of the Treasury (Treasury) implementing Second Draw Paycheck Protection Program Loans under Division A, Title I of the Coronavirus Aid, Relief, and Economic Security Act (CARES Act), the Economic Aid to Hard-Hit Small Businesses, Nonprofits, and Venues Act, and Title V of the American Rescue Plan Act of 2021 (the Paycheck Protection Program Rules).

- The Applicant, together with its affiliates (if applicable), (1) is an independent contractor, self-employed individual, or sole proprietor with no employees; (2) employs no more than 300 employees; (3) if NAICS 72, employs no more than 300 employees per physical location; (4) if a news organization that is majority owned or controlled by a NAICS code 511110 or 5151 business, a nonprofit public broadcasting entity with a trade or business under NAICS code 511110 or 5151, or an Internet-only news or periodical publisher assigned NAICS code 519130 and engaged in the collection and distribution of local or regional and national news and information, employs no more than 300 employees per location; or (5) if a 501(c)(3) organization, an eligible 501(c)(6) organization, other eligible 501(c) organization, eligible destination marketing organization, employs no more than 300 employees per physical location.

- I will comply, whenever applicable, with the civil rights and other limitations in this form.

- All loan proceeds will be used only for business-related purposes as specified in the loan application and consistent with the Paycheck Protection Program Rules including the prohibition on using loan proceeds for lobbying activities and expenditures. If Applicant is a news organization that became eligible for a loan under Section 317 of the Economic Aid to Hard-Hit Small Businesses, Nonprofits, and Venues Act, proceeds of the loan will be used to support expenses at the component of the business concern that produces or distributes locally focused or emergency information. If the Applicant is an Internet-only news or periodical publisher that became eligible for a loan under Section 5001 of the American Rescue Plan Act of 2021, the proceeds of the loan will be used to support expenses at the component of the business or organization that supports local or regional news.

- I understand that SBA encourages the purchase, to the extent feasible, of American-made equipment and products.

- The Applicant is not engaged in any activity that is illegal under federal, state or local law.

50.    Additionally, second-draw PPP applications continued to require another certification that all information provided on the application is true and accurate in all material respects as well as to certify their understanding that a false statement made in order to obtain a guaranteed loan from the SBA is punishable under the law. From SBA Form 2483-SD:

_____    I further certify that the information provided in this application and the information provided in all supporting documents and forms is true and accurate in all material respects. I understand that knowingly making a false statement to obtain a guaranteed loan from SBA is punishable under the law, including under 18 U.S.C. 1001 and 3571 by imprisonment of not more than five years and/or a fine of up to $250,000; under 15 U.S.C. 645 by imprisonment of not more than two years and/or a fine of not more than $5,000; and, if submitted to a federally insured institution, under 18 U.S.C. 1014 by imprisonment of not more than thirty years and/or a fine of not more than $1,000,000.

51.    Finally, *qui tam* lawsuits are an appropriate remedy for violations of the PPP rules and regulations. In remarks given on February 17, 2021, for example, Acting Assistant Attorney General Brian M. Boynton explained: "It is clear to me and my colleagues in the Civil Division- and I'm sure to all of you-that the False Claims Act will play a significant role in the coming years as the government grapples with the consequences of this pandemic." As he further pointed out, "[t]he vast majority of the funds distributed under these programs have gone to eligible recipients. Unfortunately, some individuals and businesses applied for-and received- payments to which they were not entitled." Accordingly, "*qui tams* will continue to be an essential source of new leads, and the Department [of Justice] will continue to rely on whistleblowers to help root out the misuse and abuse of taxpayer funds."

## VII.    DEFENDANTS' FRAUD

52.    Defendants knowingly told the SBA and participating lenders that they were qualified entities to receive PPP loans, even though they are all not-for-profit homeowners associations, condominium associations, or country clubs that do not qualify as qualified entities under Congress's act. They also all knowingly misrepresented their need for these loans. Their fraud deprived the United States of the ability to loan appropriated funds to qualified businesses, as the funding for PPP loans ran out shortly after Defendants applied for their loans.

13

53.   Defendants' false certification that they were qualified occurred despite them knowing or recklessly disregarding the fact that they were ineligible nonprofit organizations and that not-for-profit organizations like them were not eligible for-profit businesses under SBA Section 7(a) or "business interests" pursuant to the CARES Act or even SBA's guidance and regulations. In fact, the SBA published—and, upon congressional amendments, updated, FAQs for the PPP loans including an answer for "Who is Eligible"—and neither not-for-profit community associations like housing associations and condominium associations nor not-for-profit country clubs were *ever* listed in the answer to that question. The only community groups that was ever listed were housing cooperatives, and that was after specific congressional amendments to allow housing cooperatives to apply. Additionally, "non-profit businesses" were explicitly excluded in official guidance, further telling Defendants—who are all non-profit or not-for-profit organizations—that they were ineligible. Further, because the associations' lobbyists were fighting for inclusion in the PPP, the Defendants inherently knew that they could not qualify without new amendments by Congress that never materialized. Defendants realized they could slip by rushed bankers and regulators by purporting to be a "business interest" without actually being one.

54.   Defendants' other false certifications—that economic uncertainty made the PPP loans necessary to support their ongoing operations—were in bad faith, given the strong finances of Defendants and how they could raise money. The SBA required applicants to make this certification in good faith and admonished applicants to consider "their ability to access other sources of liquidity sufficient to support their ongoing operations in a manner that is not significantly detrimental to the business." The SBA even gave an example of a business that could *not* make this certification: "it is unlikely that a public company with substantial market value and

14

access to capital markets will be able to make the required certification in good faith." There is no circumstance under which a homeowners' association, condominium association, or not-for-profit country club could certify in good faith that they do not have access to other sources of liquidity to support their ongoing operations. While Defendants were not public companies, they still had substantial value of their own and access not only to capital markets but also a more readily available source of funds—the wealthy members and assets. For example, Sun City West Recreation—a 501(c)(4) nonprofit that never otherwise qualified for a PPP loan—had $28,925,372 in revenue in the fiscal year ending June 30, 2019, with $8,802,521 cash on hand at the end of the year. Sun City West Recreation's total land, buildings, and equipment are valued at over $120 million. Unlike businesses (who rely on sales by voluntary consumers, or other voluntary business) or even 501(c)(3) nonprofits (who rely on voluntary donations), housing associations, condominium associations, and not-for-profit country clubs do not rely on such voluntary funding subject to economic whims—instead, they rely on mandatory assessments and/or dues and fees from their membership. Defendants' members are particularly wealthy, often with net worth of tens of millions of dollars, and it would not have been a hardship to raise their assessments and/or dues and fees in order to continue operations even assuming the highly doubtful proposition that the pandemic represented a hardship on these defendants.

55.    Furthermore, these associations and country clubs all have statutory authority and powers including the power to make contracts and guaranties, incur liabilities, and secure its obligations by mortgage and pledge of all or any of its property, franchises or income. *See* ARIZ. REV. STAT. §§ 10-302, 10-3302. Homeowners associations and condominium associations generally have the additional powers to assess a sum of money which if not paid by the owner of a parcel, can result in a lien against the parcel. *See* ARIZ. REV. STAT. §§ 33-1255, 33-1256, 33-

15

1807. These powers are further reason that Defendants' false certifications that they needed the PPP loans were thus in knowing or reckless ignorance of their true financial situation.

56.    The Defendants' false certifications to the SBA and the lenders were material, because the SBA and lenders were relying on the honesty of applicants to process PPP loans as quickly as possible in order to get relief to American businesses as Congress intended.

57.    Moreover, most of the Defendants, building on this fraud, have already applied for loan forgiveness from the United States and had their loans forgiven in full, thus directly depriving the United States of the full amount of the loans and the interest accrued on the loans. The forgiveness actually given (and forgiveness potential for entities that have not applied) is equal to hundreds of thousands if not millions of dollars per Defendant.

58.    Some of the Defendants went even further and applied for a *second* loan, yet again fraudulently and falsely claiming that they were eligible entities under the CARES Act, even though they are just homeowners associations, condominium associations, or not-for-profit country clubs.

59.    The damages suffered by the United States extended beyond the simple amount of the loans. The damages also include the Government's other incidental expenses supporting the particular PPP loans. For example, Defendants induced the United States to pay fees to banks and other financial institutions in order to execute these fraudulent loans.

60.    Each Defendant knowingly and falsely certified that it was "eligible to receive a loan under the rules in effect at the time th[e] application is submitted." They also falsely certified that "[c]urrent economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant." Defendants each applied for and received loans in violation of the FCA as summarized in the following table:

16

| Defendant | # of Loans Rec'd | Loan(s) Amount | Date Loan(s) Approved | Loan Forgiven? | Amount of Loan Forgiven |
|---|---|---|---|---|---|
| Recreation Centers of Sun City West, Inc. (https://suncitywest.com/) | 1 | $2,245,716 | 5/2/2020 | Unknown | Unknown |
| Briarwood Country Club Inc | 1 | $431,800 | 5/4/2020 | Yes | $435,362 |
| The Country Club at DC Ranch (https://www.ccdcranch.com/) | 1 | $1,307,700 | 4/28/2020 | Yes | $1,315,292 |
| DC Ranch Association, Inc | 1 | $492,300 | 4/06/2020 | Unknown | Unknown |
| DC Ranch Community Council | 1 | $339,600 | 4/7/2020 | Unknown | Unknown |
| Flagstaff Ranch Golf Club | 1 | $462,937 | 4/8/2020 | Yes | $465,509 |
| Mirabel Golf Club, Inc. (https://www.mirabel.com/) | 1 | $931,700 | 4/6/2020 | Yes | $937,601 |
| Residence Club Scottsdale at Troon North Owners' Association | 1 | $328,200 | 5/28/2021 | Unknown | Unknown |
| Roadhaven Resort of Apache Junction Homeowners' Association | 1 | $219,275 | 2/25/2021 | Yes | $220,067 |
| Saddlebrooke Homeowners Association No. 2, Inc (https://sbhoa2.org/) | 1 | $1,260,610 | 5/1/2020 | Yes | $1,274,234 |
| Scottsdale Camelback Resort Association, Inc. | 1 | $527,600 | 4/7/2020 | Yes | $532,327 |
| Sunbird Golf Resort Homeowners Association, Inc | 1 | $237,800 | 4/28/2020 | Yes | $239,564 |
| Tanglewood Townhouse Association, Inc | 1 | $417,826 | 5/01/2020 | Yes | $423,524 |
| The Tonto Verde Association (https://www.tontoverde.org/) | 2 | $512,430 $503,700 | 8/05/2020 3/17/2021 | Yes Yes | $516,445 $506,695 |
| Tonto Verde Golf Club, Inc | 1 | $440,600 | 4/7/2020 | Yes | $443,072 |

61.    Sun City West Recreation applied for and received a PPP loan of $2,245,716, approved on May 2, 2020. In Sun City West Recreation's application, Sun City West Recreation knowingly and falsely certified that it was "eligible to receive a loan under the rules in effect at the time th[e] application is submitted." It also falsely certified that "[c]urrent economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant." The current status of this loan is unknown.

17

62.    Briarwood Club applied for and received its first PPP loan of $431,800, approved on May 4, 2020—almost a year before it would be even arguably qualified to apply for any PPP loan pursuant to the American Rescue Plan. (Briarwood Club applied for a second PPP loan after President Biden signed that law.) In Briarwood Club's first application, Briarwood Club knowingly and falsely certified that it was "eligible to receive a loan under the rules in effect at the time th[e] application is submitted." It also falsely certified that "[c]urrent economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant." Briarwood Club has applied for forgiveness, and the United States forgave its first loan (through its agent lender) in the amount of $435,362 (including interest).

63.    DC Ranch Club applied for and received a PPP loan of $1,307,700, approved on April 28, 2020. In DC Ranch Club's application, DC Ranch Club knowingly and falsely certified that it was "eligible to receive a loan under the rules in effect at the time th[e] application is submitted." It also falsely certified that "[c]urrent economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant." DC Ranch Club has applied for forgiveness, and the United States forgave this loan (through its agent lender) in the amount of $1,315,292 (including interest).

64.    DC Ranch Association applied for and received a PPP loan of $492,300, approved on April 6, 2020. In DC Ranch Association's application, DC Ranch Association knowingly and falsely certified that it was "eligible to receive a loan under the rules in effect at the time th[e] application is submitted." It also falsely certified that "[c]urrent economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant." The current status of this loan is unknown.

18

65.     DC Ranch Council applied for and received a PPP loan of $339,600, approved on April 7, 2020. In DC Ranch Council's application, DC Ranch Council knowingly and falsely certified that it was "eligible to receive a loan under the rules in effect at the time th[e] application is submitted." It also falsely certified that "[c]urrent economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant." The current status of this loan is unknown.

66.     Flagstaff Golf Club applied for and received a PPP loan of $462,937, approved on April 8, 2020. In Flagstaff Golf Club's application, Flagstaff Golf Club knowingly and falsely certified that it was "eligible to receive a loan under the rules in effect at the time th[e] application is submitted." It also falsely certified that "[c]urrent economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant." Flagstaff Golf Club has applied for forgiveness, and the United States forgave this loan (through its agent lender) in the amount of $465,509 (including interest).

67.     Mirabel Golf applied for and received a PPP loan of $931,700, approved on April 8, 2020. In Mirabel Golf's application, Mirabel Golf knowingly and falsely certified that it was "eligible to receive a loan under the rules in effect at the time th[e] application is submitted." It also falsely certified that "[c]urrent economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant." Mirabel Golf has applied for forgiveness, and the United States forgave this loan (through its agent lender) in the amount of $937,601 (including interest).

68.     Residence Club Scottsdale applied for and received a PPP loan of $328,200, approved on May 28, 2021. In Residence Club Scottsdale's application, Residence Club Scottsdale knowingly and falsely certified that it was "eligible to receive a loan under the rules in effect at

19

the time th[e] application is submitted." It also falsely certified that "[c]urrent economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant." The current status of the loan is unknown.

69.    Roadhaven Resort applied for and received a PPP loan of $219,275, approved on Debruary 25, 2021. In Roadhaven Resort's application, Roadhaven Resort knowingly and falsely certified that it was "eligible to receive a loan under the rules in effect at the time th[e] application is submitted." It also falsely certified that "[c]urrent economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant." Roadhaven Resort has applied for forgiveness, and the United States forgave this loan (through its agent lender) in the amount of $220,067 (including interest).

70.    Scottsdale Camelback applied for and received a PPP loan of $527,600, approved on April 7, 2020. In Scottsdale Camelback's application, Scottsdale Camelback knowingly and falsely certified that it was "eligible to receive a loan under the rules in effect at the time th[e] application is submitted." It also falsely certified that "[c]urrent economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant." Scottsdale Camelback has applied for forgiveness of its loan, and the United States (through tis agent lender) forgave this loan in the amount of $532,327 (including interest).

71.    Saddlebrooke HOA applied for and received a PPP loan of $1,260,610, approved on May 1, 2020. In Saddlebrooke HOA's application, Saddlebrooke HOA knowingly and falsely certified that it was "eligible to receive a loan under the rules in effect at the time th[e] application is submitted." It also falsely certified that "[c]urrent economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant." Saddlebrooke HOA has applied for

forgiveness, and the United States forgave this loan (through its agent lender) in the amount of $1,274,234 (including interest).

72.    Sunbird Golf applied for and received a PPP loan of $237,800, approved on April 28, 2020. In Sunbird Golf's application, Sunbird Golf knowingly and falsely certified that it was "eligible to receive a loan under the rules in effect at the time th[e] application is submitted." It also falsely certified that "[c]urrent economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant." Sunbird Golf has applied for forgiveness, and the United States forgave this loan (through its agent lender) in the amount of $239,564 (including interest).

73.    Tanglewood Townhouse applied for and received a PPP loan of $417,826, approved on May 1, 2020. In Tanglewood Townhouse's application, Tanglewood Townhouse knowingly and falsely certified that it was "eligible to receive a loan under the rules in effect at the time th[e] application is submitted." It also falsely certified that "[c]urrent economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant." Tanglewood Townhouse has applied for forgiveness, and the United States forgave this loan (through its agent lender) in the amount of $423,524 (including interest).

74.    Tonto Verde Association applied for and received a PPP loan of $512,430, approved on August 5, 2020. Tonto Verde Association also applied for and received a second PPP loan of $503,700, approved on May 17, 2021.  In Tonto Verde Association's applications, Tonto Verde Association knowingly and falsely certified that it was "eligible to receive a loan under the rules in effect at the time th[e] application is submitted." It also falsely certified that "[c]urrent economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant." Tonto Verde Association has applied for forgiveness, and the United States forgave

its first loan (through its agent lender) in the amount of $516,445 (including interest). Tonto Verde Association also applied for forgiveness for its second loan, and the United States forgave this second loan (through its agent lender) in the amount of $506,695 (including interest).

75.    Tonto Verde Golf applied for and received a PPP loan of $440,600, approved on April 7, 2020. In Tonto Verde Golf's application, Tonto Verde Golf knowingly and falsely certified that it was "eligible to receive a loan under the rules in effect at the time th[e] application is submitted." It also falsely certified that "[c]urrent economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant." Tonto Verde Golf has applied for forgiveness, and the United States forgave this loan (through its agent lender) in the amount of $443,072 (including interest).

## VIII.    ACTIONABLE CONDUCT BY DEFENDANTS

### A. FALSE CLAIMS ACT

76.    This is an action to recover damages and civil penalties on behalf of the United States and the Relator arising from false or fraudulent statements, claims, and acts by Defendants made in violation of the False Claims Act, 31 U.S.C. §§ 3729–32.

77.    The FCA provides that any person who:

> (A) knowingly presents, or causes to be presented, a false claim or fraudulent claim for approval; [or]
> (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;
>
> …

is liable to the Government for a civil penalty not less than $11,665 and not more than $22,331 for each such claim, plus three times the amount of damages sustained by the Government because of the false or fraudulent claim. *See* 31 U.S.C. § 3729(a)(1).

22

78.    The FCA defines "claim" as:

(A) [] any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that—

(i) is presented to an officer, employee, or agent of the United States; or

(ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government—

(31)    provides or has provided any portion of the money or property requested or demanded; or

(II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded. ...

31 U.S.C. § 3729(b)(2).

79.    The FCA allows any persons having knowledge of a false or fraudulent claim against the Government to bring an action in federal district court for themselves and for the Government and to share in any recovery as authorized by 31 U.S.C. § 3730.

80.    Based on these provisions, Relator Riner, on behalf of the United States and on his own behalf, seeks through this action to recover damages and civil penalties arising from Defendants' violations of the False Claims Act.

## B. DEFENDANTS' VIOLATIONS OF THE FALSE CLAIMS ACT

### i.    Presentation of False or Fraudulent Claims (31 U.S.C. § 3729(a)(1)(A))

81.    In 2020 and 2021, Defendants knowingly presented false and fraudulent claims for payment and approval directly to their lenders, deputized agents of the United States government, which falsely stated that they were eligible entities for PPP loans and that they needed the loans in order to support their ongoing operations. The falseness of these claims was exacerbated when

23

Defendants applied for forgiveness of their loans and falsely certified that they complied with all the requirements of the PPP Rules.

82. Due to Defendants' actions, Defendants collectively borrowed millions of dollars of forgivable loans that, even if paid back, are also set at a below-market interest rate. These loans were disbursed at the expense of countless United States businesses who qualified for PPP loans but could not apply because Congress's funding ran out. Additionally, the United States has paid millions of dollars to lenders for the forgiven loans, which is now lost. Accordingly, the United States has suffered actual damages and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

### ii. Making or Using—or causing to be made or used—False Records or Statements Material to False or Fraudulent Claims (31 U.S.C. § 3729(a)(1)(B))

83. In 2020 and 2021, Defendants made, use, or caused to be made or used, false records or statements material to false or fraudulent claims paid or approved by the Government.

84. Defendants knew that their applications falsely certified that they were entities eligible to receive PPP loans and that they falsely certified that the PPP loans were necessary to support ongoing operations. Beyond Defendants' own direct claims, Defendants' false statements knowingly caused these false claims, which were material to the lenders' eventual claims to the United States for additional interest and loan-forgiveness reimbursement.

85. Due to Defendants' actions, Defendants collectively borrowed millions of dollars of forgivable loans that their lenders' then received millions of dollars in payments for administering and reimbursing. The United States disbursed this money to the lenders at the expense of countless United States businesses who qualified for PPP loans but could not apply because Congress's funding ran out. Additionally, the United States has paid millions of dollars to lenders for the forgiven loans, which is now lost. Accordingly, the United States has suffered actual

24

damages and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

## C. DEFENDANTS' VIOLATIONS OF THE FALSE CLAIMS ACT ARE MATERIAL.

86.    A false or fraudulent claim under subsection (a)(1)(A) or a false record or statement under subsection (a)(1)(B) subjects a defendant to liability if it is material. The False Claims Act defines "material" as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

87.    The United States set up a multi-part process of reliance on others in order to expeditiously execute the PPP program and keep the economy on track despite the COVID-19 Pandemic. First, Congress and the SBA authorized certain lenders to issue PPP loans without the Government's prior review or express approval. Second, although lenders were delegated the responsibility for determining borrower eligibility, the lenders were directed to use forms promulgated by the SBA that included numerous certifications—including a certification of eligibility.

88.    The lenders—and thus by extension the United States Government—relied heavily on these certifications. Indeed, when the PPP was originally funded with $349 Billion, those funds were depleted less than three weeks after the CARES Act first passed. Lenders and the United States Government instinctively relied on applicants' promises of eligibility, particularly when no data submitted on the application obviously indicated ineligibility.

89.    In particular, to process loans so quickly, lenders utilized an automated tool that compared loan data against publicly available information and identified anomalies that may indicate non-compliance purely based on this data. *See* SBA Procedural Notice, No. 5000-20092

25

(Feb. 10, 2021).[1] This data was largely limited to information about the number of employees and payroll size of applicant companies, which were key components to qualifications as well. The automated tool's focus on this data, however, meant that qualifications such as the fact that only certain types of entities ("business interests" and certain specified other organizations) were less noticeable and more tied to applicants' certification that they qualified for the PPP loan in the first instance.

90.    The SBA sometimes conducted additional data analysis beyond the automated tool in order to identify noncompliant applicants. But again, their data analysis was limited to the data available and necessarily was unable to catch entities that applied for PPP loans but were not "business interests" or other qualified organizations. Again, the SBA relied on the certifications of applicants that they were qualified for SBA loans.

91.    By making false and fraudulent misrepresentations that they were qualified for PPP loans and that they complied with all PPP requirements, the Defendants here took advantage of the automated tool and data analyses used by lenders and the United States Government in order to defraud those institutions. Defendants' certifications of qualification and compliance, notwithstanding their knowledge that they did not qualify due to their HOA and condominium-association and not-for-profit country-club statuses, not only had the natural tendency to influence the award and forgiveness of PPP loans but in fact did so. Defendants' fraudulent and false certifications specifically evaded the compliance measures used by the United States Government and participating lenders. Had Defendants told the truth, and noted that they lacked qualification (or even that their qualifications were questionable) due to their HOA or condominium-association

---

[1]    *Available at* https://www.sba.gov/sites/default/files/2021-02/Procedural%20Notice%205000-20092%20-%20Revised%20PPP%20Procedures%20to%20Address%20Hold%20Codes-508.pdf.

or not-for-profit country-club status, they would not have received PPP loans or forgiveness for those loans.

## IX.   CAUSES OF ACTION

A.   COUNT I – PRESENTATION OF FALSE OR FRAUDULENT CLAIMS (31 U.S.C. § 3729(a)(1)(A))

92.     Relator alleges and incorporates by reference each and every allegation contained in paragraphs 1–80, 81–82, and 86–91 of this Complaint.

93.     In 2020 and 2021, Defendants knowingly presented or caused to be presented false or fraudulent claims for payment or approval to the United States Government for PPP Loans and forgiveness of their PPP Loans.

94.     Specifically, Defendants submitted or caused the submission of false or fraudulent claims when they applied for PPP loans and falsely and fraudulently stated that they were eligible entities for PPP loans and that they needed the loans in order to support their ongoing operations, even though they knew that they were ineligible and that they did not need the loans to support their ongoing obligations.

95.     The false PPP applications were "claims" under the FCA because they were "request[s] or demand[s] … for money or property … that" were "presented to an officer, employee, or *agent* of the United States." 31 U.S.C. § 3729(b)(2)(A)(i) (emphasis added). Indeed, they were requests for money submitted directly to financial institutions as agents of the United States. Alternatively, the PPP applications were claims because the financial institutions were "contractor[s], grantee[s], or other recipient[s]" of money who would be "reimburse[d] … for any portion of the money or property which [wa]s requested or demanded." *Id.* § 3729(b)(2)(A)(ii).

96.     Defendants also submitted or caused submission of claims when they applied for forgiveness of their PPP loans and falsely and fraudulently certified that they complied with all the requirements of the PPP Rules, even though they knew they did not.

97.     The applications for forgiveness were likewise additional claims, because they further "request[ed] or demand[ed]" money or property from the United States, similar to the initial PPP loan applications. *See* 31 U.S.C. § 3729(b)(2)(A).

98.     The United States Government, unaware of the material falsity of the claims made or caused to be made by Defendants, approved, paid, and participated in payments made by the Government's fiscal intermediaries for loans that were not allowed and in loan forgiveness that otherwise was not allowed.

99.     By reason of these payments, approvals, and loan forgivenesses, the Government has been damaged in an amount yet to be determined. Accordingly, the United States suffered actual damages and is entitled to recover treble damages plus a civil monetary penalty for each presentment of a false claim.

**B.     COUNT II – MAKING OR USING FALSE STATEMENTS MATERIAL TO FALSE OR FRAUDULENT CLAIMS (31 U.S.C. § 3729(a)(1)(B))**

100.    Relator alleges and incorporates by reference each and every allegation contained in paragraphs 1–80, 83–85, and 86–91 of this Complaint.

101.    In 2020 and 2021, Defendants knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims paid or approved by the Government.

102.    Defendants' statements of eligibility in their PPP applications were false. Defendants knew that these statements were false because Defendants knew that they were not business entities eligible to receive PPP loans.

28

103.    Defendants' statements in their PPP applications that they that they needed the loans in order to support their ongoing operations were false. Defendants knew that these statements were false because they knew that they could continue their ongoing operations without a PPP loan.

104.    Defendants' statements in their applications for forgiveness that they complied with all the requirements of the PPP Rules were false. Defendants knew that these statements were false because they were ineligible for PPP loans and that they did not need the loans in order to support their ongoing operations.

105.    Defendants' false statements herein were material to their claims false and fraudulent claims for payment and approval that would be made to the United States Government in conjunction with their statements. The statements also made the financial institutions' claims for payment and reimbursement of loan money false and were material to those false claims, as well.

106.    Defendants' false statements were material because the Government's lending agents—and by extension the United States Government itself—heavily relied on these certifications in processing PPP loans as quickly as possible with the assistance of an automated tool that itself would trust these certifications. Defendants' false statements thus not only had the natural tendency to influence the award and forgiveness of PPP loans but in fact did so.

107.    The United States Government, unaware of the material falsity of the claims made or caused to be made by Defendants due to these material statements, approved, paid, and participated in payments and forgiveness for loans that were not allowed.

108.    But for Defendants' use of the materially false statements, the PPP loans would not have been paid.

29

109.    Because of their false or fraudulent statements, Defendants earned millions of dollars through PPP loans to which they are not legitimately entitled. The ultimate submission to the federal Government of claims for payment was a foreseeable consequence of this fraud. As a result, the United States has suffered substantial damages and is entitled to recover treble damages and civil monetary penalties.

## X.    PRAYER FOR RELIEF

110.    WHEREFORE, Riner respectfully requests the Court enter judgment against Defendants for violations of the FCA and award the following:

   a.   damages in the amount of three times the actual damages suffered by the United States as a result of Defendants' conduct;

   b.   Civil penalties against Defendants up to the maximum allowed by law for each violation of 31 U.S.C. § 3729;

   c.   The maximum award Relator may recover pursuant to 31 U.S.C. § 3730(d);

   d.   All costs and expenses of the litigation, including attorneys' fees and costs of court; and

   e.   All other relief on behalf of Relator or the United States that the Court deems just and proper.

## XI.    DEMAND FOR JURY TRIAL

111.    Pursuant to Federal Rule of Civil Procedure 38, Relator demands a trial by jury.

Respectfully submitted,

Randall C. Owens
State Bar No. 15380700

30

Michael Adams-Hurta
State Bar No. 24097860
**WRIGHT CLOSE & BARGER, LLP**
One Riverway, Suite 2200
Houston, Texas 77056
Telephone: (713) 572-4321
Telecopier: (713) 572-4320
owens@wrightclosebarger.com
hurta@wrightclosebarger.com
***Attorneys for Relator Wade Riner***

## CERTIFICATE OF SERVICE

I hereby certify that on August 22, 2022, a true and correct copy of this Original Complaint was forwarded to the United States Attorney's Office for the District of Arizona and the Department of Justice in Washington, D.C. via certified mail, return receipt requested.

*/s/ Michael Adams-Hurta*
Michael Adams-Hurta